UNITED STATES OF AMERICA
DISTRICT COURT OF THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**JANE A. DOE, JANE B. DOE,
JANE K. DOE, and JANE N. DOE**

Case No. 2:26-cv-173

      Plaintiffs,

Hon.
U.S. Magistrate Judge

v.

**MICHIGAN DEPARTMENT
OF CORRECTIONS**

      Defendant.

---

## COMPLAINT AND JURY DEMAND

Plaintiffs file their complaint against the Michigan Department of Corrections as follows:

### PRELIMINARY STATEMENT

This case arises from years of sexual harassment, assault, and rape inflicted on four women employed at the Marquette Branch Prison by Corrections Officer Gerald Burton. After the women bravely came forward, instead of protecting them, the Michigan Department of Corrections disregarded its own policies, failed to properly investigate, and continued to employ Burton, where he enjoyed unsupervised access to Plaintiffs, other female employees, and witnesses.

Plaintiffs suffered hostility, undesirable assignments, and other forms of retaliation, even after Burton was criminally prosecuted for criminal sexual conduct against five victims, for which he was eventually convicted. These courageous survivors now file suit under Title VII, the Elliott-Larsen Civil Rights Act, and the Family and Medical Leave Act to hold Defendant accountable for knowingly creating a hostile environment that ignored their safety, enabling Burton's predatory behavior, and punishing them for speaking up to report Burton's actions.

1

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiffs Jane A. Doe, Jane B. Doe, Jane K. Doe, and Jane N. Doe are residents of the County of Marquette, Michigan.

2.      All four Plaintiffs request pseudonymity due to their status as victims of criminal sexual assault. Defendant will be aware of their true identities from the allegations in this suit. The Plaintiffs will file an appropriate motion for pseudonymity if necessary and requested by the Court.

3.      Defendant Michigan Department of Corrections (MDOC) is a Michigan governmental agency headquartered in Lansing, Michigan and conducting operations throughout the State of Michigan.

4.      At all relevant times, Plaintiffs were employees of Defendant MDOC, working at the Marquette Branch Prison (MBP) located in the County of Marquette, at 1960 US Hwy 41 S., Marquette, Michigan 49855.

5.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. 1331 (federal question). This action arises under Title VII of the Civil Rights Act of 1964, 42 USC 2000e-2; 29 CFR 1604.1 *et seq*., 28 U.S.C. 1343 (civil rights jurisdiction). Plaintiff Jane B. Doe also asserts claims under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

6.      This Court has supplemental jurisdiction over Plaintiffs' related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in the Northern District of the Western District of Michigan, as Plaintiffs reside in Marquette County, Michigan, and the events giving rise to their claims occurred at their place of employment in Marquette County, Michigan.

8. Plaintiffs each timely filed charges of discrimination and retaliation with the Equal Employment Rights Opportunity Commission (EEOC), and each received a Right to Sue letter from the EEOC as follows:

a. Jane K. Doe - EEOC Charge No. 471-2025-04390 filed April 21, 2025, right to sue letter received April 29, 2026;

b. Jane B. Doe - EEOC Charge No. 471-2025-04568 filed April 28, 2025, right to sue letter received April 30, 2026, and EEOC Charge No. 471-2026-04785, right to sue letter received April 30, 2026;

c. Jane N. Doe – EEOC Charge No. 471-2025-04394, right to sue letter received April 29, 2026, and EEOC Charge No. 471-2026-04758, right to sue letter received April 30, 2026; and

d. Jane A. Doe – EEOC Charge No. 471-2025-04396 filed April 21, 2025, right to sue letter received April 30, 2026, and EEOC Charge No. 471-2026-04712, right to sue letter received April 30, 2026.

9. This lawsuit is timely as it is filed within 90 days of their Right to Sue Letters.

10. Plaintiffs each timely filed Notices of Intention with the Michigan Court of Claims as follows:

a. Jane K. Doe on February 5, 2025, (Court of Claims Tracking No. 25-200050-O), supplement filed April 4, 2025 (Court of Claims Tracking No. 25-200138-O);

b. Jane B. Doe on March 31, 2025, (Court of Claims Tracking No. 25-200115-O), supplement filed April 13, 2026 (Court of Claims Tracking No. 26-200200-O);

c. Jane N. Doe on March 27, 2025, (Court of Claims Tracking No. 25-200111-O), supplement filed April 10, 2026 (Court of Claims Tracking No. 26-200196-O); and

d.  Jane A. Doe on March 28, 2025, (Court of Claims Tracking No. 25-25-200113-O), supplement filed April 10, 2026 (Court of Claims Tracking No. 26-200197-O).

## FACTUAL ALLEGATIONS

### Jane K. Doe

11.    Plaintiff Jane K. Doe has been employed by Defendant MDOC as a registered nurse at the MBP since the spring of 2019.

12.    It was there at the MBP that she met Corrections Officer Gerald Burton.

13.    Initially, Burton was charming and flirtatious.

14.    Jane K. Doe soon saw a darker side of Burton when she began to rebuff his advances; he simply would not take "no" for an answer.

15.    In October of 2020, Jane K. Doe began working night shift alone in the nurses' station. Aware of this, Burton began to actively seek her out.

16.    Over the course of the next several years, Jane K. Doe was subject to repeated, unwelcome, and progressively offensive comments and conduct of a sexual nature by Burton.

17.    Whenever he was alone with her, out of camera view, he would sexually harass or assault her.

18.    He would often touch himself sexually and then interchangeably kiss and grope her, pull her pants down, and insert his fingers into her vagina. When she tried to leave, he blocked her exit and physically held her against the wall.

19.    On two separate occasions, he raped her at work.

20.    After he learned where she lived, he also raped her in her home.

4

21.     Following the first rape, Jane K. Doe was crying and traumatized, she successfully sought out another corrections officer to stay with her at the nurses' station for the balance of her shift.

22.     Afterward, Burton acted like nothing happened; he made it seem as though she had somehow wanted or invited his advances.

23.     Knowing it would be her word against his, Jane K. Doe did not report the incidents based on prior experience and concern for her job.

24.     Instead, she modified her work habits and her pants, wore high waisted underwear, and eventually secured a day shift position to avoid solo encounters with Burton.

25.     From October 2022 through September 2024, the presence of Jane K. Doe's day shift work partner helped shield her from Burton's unwanted sexual advances.

26.     While her work partner's presence did not eliminate Burton's unwanted advances, it did greatly reduce the number of encounters she had with him.

27.     Jane K. Doe's work partner was offered other employment in August/September 2024 and chose to take it, which meant Jane K. Doe would be the only RN working her rotation until he got replaced.

28.     When Jane K. Doe realized this, she became concerned knowing she would have nobody with her in the nurses' station to protect her from Burton until a replacement was found.

29.     As her work partner's last day approached, her anxiety skyrocketed.

30.     At the same time, Jane K. Doe became aware of additional victims who were willing to come forward.

**Jane N. Doe**

31.    Plaintiff Jane N. Doe has been employed by Defendant MDOC as a Pharmacy Assistant at the MBP since 2012.

32.    Although twice his age and old enough to be his mother, Jane N. Doe' age did not protect her from Burton.

33.    Initially, he was playful and joking. He would tug at her pants and tease her.

34.    In late winter of 2023 or early spring of 2024, Burton intentionally slapped Jane N. Doe on her rear end.

35.    Shocked, she rebuked him and he backed off.

36.    Burton continued, however, to pull and tug at her pants whenever he got the chance. He was so persistent, she purchased a band to tie around the waist of her scrubs so he couldn't tug them down.

37.    When Jane N. Doe began hearing about Burton's inappropriate interactions with other women, she confided in Jane K. Doe and encouraged her to report what was going on.

**Jane A. Doe**

38.    Plaintiff  Jane A. Doe was employed by Defendant MDOC as a Licensed Practical Nurse at the MBP for about five years.

39.    She no longer works there. Her last day worked at the MBP was February 10, 2026.

40.    During her employment, Jane A. Doe observed Burton being "extra friendly" with women and had heard that he had groped another woman.

41.    Frequently, when she walked up the stairs during med pass, he would reach through the rails and jokingly grab at her ankles.

42. In August 2024, Burton escorted Jane A. Doe to the housing unit to pass meds. When she got up to get out of the gator (side-by-side), he forcefully grabbed her buttock.

43. Earlier that same day, Burton had lifted her up in the nurses' station. He came up from behind, wrapped his arms around her and lifted her up. When she asked what he was doing, he said "I'm showing you how strong I am."

44. After learning that others had been physically assaulted by Burton, Jane A. Doe spoke with Jane K. Doe to let her know that Burton had been physical with her and that she was willing to bring his misconduct to light.

**Jane B. Doe**

45. Plaintiff Jane B. Doe was employed by Defendant MDOC for approximately eight years as a corrections officer.

46. She is no longer employed by the MDOC. Her last day of employment with the MDOC was August 29, 2025.

47. Like the other Plaintiffs, Jane B. Doe met Burton at the MBP.

48. Initially, Burton was friendly and playful.

49. In 2021, however, Burton raped Jane B. Doe in her own home.

50. After the rape, he left her alone for about a year.

51. In 2022, Jane B. Doe met Jane K. Doe working night shift. They became friends and Jane K. Doe told Jane B. Doe that Burton was "really grabby" with her at the nurses' station.

52. Jane B. Doe told Jane K. Doe to be careful and confidentially shared her experience regarding the rape.

53.    In the summer of 2023, following Jane B. Doe's divorce, Burton began to sexually harass Jane B. Doe at work, subjecting her to repeated, unwelcome, and progressively offensive comments and conduct of a sexual nature.

54.    As time went on, he became more assertive and hands-on.

55.    Like Jane K. Doe, Jane B. Doe did her best to deal with it on her own, avoiding work assignments that brought her in contact with Burton.

56.    In March 2024, Jane B. Doe began taking intermittent FMLA due to a serious health condition.

57.    In late May 2024, she was placed on light duty and assigned to work in the Sallyport (secure entrance/exit for Level 1) and Arsenal (weapons storehouse). Both were single-man assignments without camera coverage.

58.    During this time, Burton's aggression increased and he sexually harassed and assaulted her whenever he had the opportunity, despite her protests and efforts to avoid him.

59.    Burton would come into the Arsenal and come at her with both hands, grabbing her breasts and then leave.

60.    While in the Arsenal, he also approached her face-to-face, put his arms around her, picked her up by her rear and put her on the counter.

61.    Jane B. Doe did her best to avoid him, but she was alone and unwell, and he was persistent.

62.    Jane B. Doe was afraid to report Burton due to the "code of silence" that applied to female corrections officers at the MBP. She reasonably believed her career would be over if she attempted to report anything.

63.     Early in her career, another female corrections officer started a rumor that Jane B. Doe had a history of reporting male coworkers for harassment. It took years for her to overcome that rumor.

64.     She quickly learned that you can't say anything, or nobody would have your back.

65.     She remembered how she felt back then; entire shifts where nobody would talk to her except to say, "this isn't a place for women."

66.     She was also aware of other women who had complained of sexual harassment and ended up leaving the MBP, including one who had alleged that Burton raped her.

67.     To avoid Burton, Jane B. Doe took intermittent FMLA leave on days when her schedule overlapped with his due to the enormous stress she experienced when working with him, which exacerbated her serious health condition.

68.     She also applied for numerous vacancies that she was physically able to perform and that would have taken her out of Burton's reach, but she was passed over due to "time and attendance" issues involving her use of intermittent FMLA.

69.     During this time, Jane B. Doe and Jane K. Doe discussed Burton's increased aggression and "grabbiness" and both agreed that something needed to be done.

70.     In August 2024, Burton sexually assaulted Jane B. Doe in the Sallyport for the last time, grabbing her crotch and buttocks from behind so aggressively she screamed in pain and punched him.

71.     Shortly thereafter, in September 2024, at the age of 39, Jane B. Doe suffered a cardiac event.

72.     Jane B. Doe's cardiac event led to the discovery that she had suffered a series of cardiac events starting in May of that year and culminating in September. Fortunately, she survived but was forced to take FMLA to recover.

73.     Jane B. Doe returned to work from FMLA leave October 3, 2024.

**The Report**

74.     That same day (October 3, 2024), Jane K. Doe, Jane N. Doe, and Jane A. Doe reported Burton's sexual misconduct to their Nursing Supervisor, Brenda James.

75.     James promptly relayed their reports through appropriate channels to the warden's office.

76.     James' email identified six different victims – all of whom were female MBP employees.

77.     Given the seriousness of the allegations, the warden could have placed Burton on paid administrative leave pending investigation, a fairly common occurrence at the MBP.

78.     She did not do so.

79.     Instead, she referred the matter to the Michigan State Police for a criminal investigation and reached out to Burton to see how he was doing.

80.     Despite reaching out to Burton, the warden did not initially contact any of the Plaintiffs.

**MDOC's Response Did Not Follow Policy**

81.     In the weeks that followed, MDOC ignored its own discriminatory harassment policy.

82.     Among other things, MDOC did not:

a. Request a written statement or a Discriminatory Harassment Complaint form (CAJ-339) from Plaintiffs.

b. Promptly enter the complaints into the Department's Administrative Investigation Management (AIM) database.

c. Assign an AIM number.

d. Take immediate action to stop the discriminatory harassment or prevent further harassment.

e. Advise Plaintiffs of their rights under the policy, including notifying them that appropriate action would be taken to protect them from retaliation.

f. Offer Plaintiffs assistance in completing a Discriminatory Harassment Complaint Form (CAJ-339) to ensure that all relevant information was reported, including witness information.

g. Ask Plaintiffs to sign a complaint form or to verify its accuracy.

h. Send Plaintiffs or Burton required notices within one business day of receipt of the complaint, informing them of the complaint and pending investigation, prohibiting retaliation, limiting their non-essential contact with each other, and restricting their discussion of the matter (while under investigation).

i. Make an initial determination as to whether the allegations, if proven true, would constitute discriminatory harassment or document such determination.

j. Promptly refer the case to Internal Affairs for processing and investigation.

k. Inform Plaintiffs in writing whether the allegations met the purview for discriminatory harassment.

l. Complete the investigation within 45 days of assignment.

83.    Instead, what happened next confirmed Plaintiffs' fears about reporting.

84.    When Jane B. Doe reported to work October 4, the day after the complaint, she discovered Burton had come off vacation to work as Tower officer.

85.    As part of his Tower officer duties, Burton spent the first hour of his day in the Sallyport, within an arm's length of Jane B. Doe.

86.    Based on his demeanor and actions, Jane B. Doe could tell he knew about the complaint.

87.    The unexpected encounter was traumatizing; she didn't feel safe or heard.

88.    When Jane K. Doe complained about Burton's continued access to Plaintiffs, the warden inexplicably changed Burton's work assignment to Level 1, where Jane B. Doe and Jane A. Doe were working.

89.    To avoid Burton and the stress associated with encounters with him, Jane B. Doe missed even more work and pressed her provider for a full duty release on October 13, so that she no longer had to worry about being alone with him.

90.    Making matters worse, within days of the complaint, it became common knowledge among employees at the MBP due to a leak from the warden's office.

91.    Because Burton continued to work and was outspoken about his alleged innocence, Plaintiffs' work environment became even more hostile.

92.    Jane B. Doe was confronted about the allegations at work by Corrections Officer Alex Traeger, who told her he "heard a rumor and your name came up." He then proceeded to tell her it was "bullshit" and she knew it.

93.    Jane K. Doe was also subject to a hostile incident in the parking lot by ADW Hoult, who went out of his way to try to intimidate her by driving at her with his vehicle.

94.    Collectively, the corrections officers who sided with Burton intimidated, badmouthed, and ostracized Plaintiffs.

95.    Among other things, Plaintiffs were ignored, given silent treatment, and subject to snide and derogatory comments.

96.    None of them felt safe at work.

97.    Both Jane K. Doe and Jane B. Doe missed work in an effort to avoid Burton and the increased hostility they faced in the workplace.

98.    Plaintiffs reported these interactions and changes in work environment / treatment to management, but nothing came of it.

**The "Investigation"**

99.    Following Jane K. Doe's repeated requests for an update on the status of their complaint, Internal Affairs finally sent an investigator to the MBP on November 7, 2024.

100.    But for Jane K. Doe's repeated inquiries, it is unlikely the internal investigation would have occurred at all.

101.    The delay worked in Burton's favor. He used this time to contact and intimidate witnesses, put together a defense, and wrongfully malign Plaintiffs' character, especially Jane K. Doe's.

102.    Burton falsely claimed that his encounters with Jane K. Doe and the others were consensual and that Jane K. Doe had only complained after he began pursuing other women.

103.    He also alleged that Jane K. Doe had consensual sexual relations with multiple male employees while at work.

104.    Although Burton resigned shortly after the investigation was launched, the investigator appeared to accept Burton's story.

105.    She spent very little time with Plaintiffs – relying instead on the concurrent criminal investigation by the MSP.

106.    She did not interview a single person who could have verified Jane K. Doe's efforts to avoid Burton at work, including the corrections officer who protected Jane K. Doe following the first rape.

107.    She did not interview Jane A. Doe at all.

108.    She did, however, circulate questionnaires to the four male employees who Burton claimed Jane K. Doe had also had sex with at work, stating that Jane K. Doe had accused Burton of sexually harassing her, that it had been reported that Jane K. Doe had consensual sex with several male staff at work, including them, and asking whether this was true – all four males denied any such encounter.

109.    Evidence Jane K. Doe supplied to the investigator, including hundreds of messages to corroborate her experience, was not attached to her report.

110.    The only messages attached to the investigator's report came from Burton and his wife.

111.    When Jane K. Doe asked the investigator why Burton was permitted to continue working, she was simply advised that the criminal investigation was ongoing and that if there was enough evidence, the police would let the facility know and that the facility would then put Burton on stop order (paid leave).

112.    Then, the investigator opened a separate investigation into Jane K. Doe based on a domestic violence incident involving another corrections officer (Eric Minthorn), causing further discouragement and trauma.

14

113. Months later, Plaintiffs were notified by Internal Affairs that there was insufficient evidence to support their complaints.

114. When Jane K. Doe followed up with the investigator, she was informed that she was mistaken, and that the investigation was still ongoing.

115. Eventually, Plaintiffs received another letter with a different AIM investigation number indicating that the investigation was over and that no action was taken because Burton had resigned.

### Plaintiffs' MDOC Careers Were Permanently Affected

116. In the months following her complaint and charge of discrimination, Jane K. Doe faced an onslaught of false and malicious rumors and behavior designed to end her MDOC career.

117. In addition to the foregoing acts of retaliation, Corrections Officer James Fish falsely accused Jane K. Doe of bringing drugs and cell phones into the MBP.

118. Joining the bandwagon with Fish, another corrections officer brought Jane K. Doe a note from a prisoner in an effort to set her up for a policy violation.

119. And the officers in Delta unit tried to get Jane K. Doe to do rounds by herself, which is both unsafe and against policy.

120. Jane K. Doe reported Fish in July of 2025, but her allegations were not investigated until April 2026. By then, Fish was no longer employed by the MDOC.

121. Concerned for her safety, James provided Jane K. Doe with alternative assignments, but no matter what she did, Jane K. Doe remained a target.

122. Jane K. Doe missed even more work – using up her annual and sick leave.

123.    Incredibly, Jane K. Doe was almost disciplined for her alleged role in the Minthorn domestic violence incident, wherein she received a black eye and broken nose, but too much time had passed under the collective bargaining agreement.

124.    Minthorn has since pled no contest to a charge of domestic violence related to a subsequent incident involving another victim.

125.    To this day, Jane K. Doe continues to face repercussions from her report against Burton.

126.    Initially, as described above, Jane N. Doe faced similar repercussions for reporting and participating in the investigation that ensued.

127.    More recently, in January 2026, Jane N. Doe was denied paid bereavement leave in connection with the passing of her grandmother, allegedly because it was against policy, however the MDOC frequently grants paid bereavement leave outside of the policy.

128.    For example, MDOC granted paid bereavement leave under the same policy and circumstances (passing of a grandmother) to another female coworker who recanted her statements related to the reported sexual misconduct.

129.    In addition to the retaliation she experienced from corrections officers who were supposed to protect her on the floor, Jane A. Doe's complaint resulted in her reassignment.

130.    Prior to reporting Burton's sexual misconduct, Jane A. Doe was working in Level 1 as a MAT (Medication Assistant Treatment) day shift nurse for over a year.

131.    Following her complaint, she was pulled from the program, reassigned to a new area, and placed on a 12-hour shift schedule with mandated overtime.

132.    When Burton resigned, she asked to be returned to this position, but her request was denied.

16

133.    In late December 2025 / early January 2026, a Level 1 day shift MAT position became available.

134.    Despite her seniority and former request to return to the program and schedule she held prior to her protected activity, she was not given the opportunity to return.

135.    Instead, a junior employee with less than a year of seniority was given the position.

136.    Jane A. Doe's reassignment and the MDOC's refusal to return her to the position she held prior to making an internal complaint and filing a charge of discrimination with the EEOC caused substantial hardship for her, requiring long hours away from her young family and a more difficult work environment.

137.    Ultimately, MDOC's retaliatory action in reassigning Jane A. Doe and refusing to reinstate her to her former position (even when a position opened) resulted in her constructive discharge from employment. Her last day worked at the MBP was February 10, 2026.

138.    Jane B. Doe was also deprived of job opportunities based on her protected activity.

139.    Prior to being placed on light duty, Jane B. Doe was the regular housing unit officer in Level V (maximum security) Echo block (E-block) for more than a year. She primarily worked as the desk officer – an administrative position.

140.    When released from light duty, she was scheduled in Level V, Gulf block (G-block), which housed the general population and is less desirable as it is hard work and far more dangerous.

141.    In E-block, there were 57 cells and inmates did not come out of their cells unless in chains.  In G-block, there were 150 cells and inmates were not chained when they left their cells. G-block at the MBP is notorious for being one of the most dangerous assignments within the MDOC.

142. Moreover, Jane B. Doe was rotated as the third officer in G-block, working under officers with significantly less time and seniority. This was highly unusual as the third officer scheduled is typically the officer with the least amount of seniority, as it is the least desirable position based on job duties.

143. When prisoners made threats of harm against Jane B. Doe and her family, she was not reassigned to another location, as is commonly done.

144. And when inmates attacked fellow officers on her shift, she was the only officer not excused from her assignment for the rest of shift.

145. Due to these adverse changes in her work environment, Jane B. Doe made numerous requests to work out of classification.

146. The last week in January 2025, she was given the opportunity to work out of classification as librarian until the position was filled. She was not qualified for the position because she did not have a master's degree in library science.

147. Jane B. Doe began working as acting librarian on February 3, 2025.

148. Based on the warden's encouragement, she also assumed the duties of acting chaplain the week of March 31, 2025.

149. Jane B. Doe successfully performed the duties of acting librarian and chaplain until June 15, 2025, when a full-time librarian was hired.

150. The chaplain vacancy was posted May 2, 2025 – one month after she filed her Notice of Intent and four days after she filed a charge of discrimination with the EEOC.

151. She applied for the position but did not get an interview.

152. When she asked why, she was informed she was not qualified because the position was posted as an institutional chaplain Grade 12 and she was only qualified at Grade 11.

18

153.    The warden has the final say on all posting requirements.

154.    Chaplains are normally posted at Grade 9-11 throughout the MDOC. The prior chaplain at MBP had started at Grade 9 before working his way up to Grade 12.

155.    Prior to filing a Notice of Intent with the Court of Claims and charge of discrimination with the EEOC, the warden had encouraged Jane B. Doe to apply for the position, specifically telling her she was qualified and would be a great candidate.

156.    Because she was deemed "not qualified" for the chaplain position, Jane B. Doe was told she would have to return to the floor as a corrections officer when the position was filled.

157.    The chaplain position was filled August 31, 2025, by an external male.

158.    Jane B. Doe's forced return to the floor resulted in her constructive discharge as she was unable to bring herself to return to the floor as a corrections officer. Given the change in working conditions since her report, she no longer felt safe working in that capacity and felt she had no option but to resign.

### Burton's Criminal Conviction

159.    While Plaintiffs' reports of sexual misconduct within the prison walls did not result in criminal charges against Burton, they did result in the discovery of multiple other sexual assault victims.

160.    In May 2025, Burton was arrested and arraigned for multiple criminal sexual conduct charges, including three felonies, involving multiple victims.

161.    In May 2026, Burton was convicted of nine felonies (five first-degree CSCs and four third-degree CSCs) involving five different victims, including one first-degree CSC and two third-degree CSCs specific to Jane B. Doe (related to the rape that occurred in her home in 2021).

162.    Burton is currently lodged in the Marquette County jail, awaiting sentencing.

**LEGAL ALLEGATIONS**

**COUNT I**
**Sexual Harassment / Hostile Work Environment in Violation of Title VII**

163.    Defendant was, at all relevant times, an employer as defined by Title VII of the Civil Rights Act of 1964.

164.    Plaintiffs were, at all relevant times, employees as defined by Title VII.

165.    As females, Plaintiffs were protected persons under Title VII based on their sex.

166.    Plaintiffs were subject to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, conduct and unwanted sexual harassment and assault, as set forth above.

167.    The hostile work environment was based on Plaintiffs' sex.

168.    The hostile work environment unreasonably interfered with Plaintiffs' work environment.

169.    Despite having a sexual harassment policy, Defendants did not enforce the policy and created an environment wherein women were penalized for making reports of sexual harassment and assault.

170.    Defendant's failure to enforce their policy created a reluctance by Plaintiffs and other women to report sexual harassment and misconduct.

171.    Defendants had actual or constructive knowledge of Burton's predatory behavior toward women and did nothing to protect Plaintiffs from him.

172.    Defendant's failure to promptly investigate Plaintiffs' report of sexual harassment and misconduct against Corrections Officer Burton and failure to protect Plaintiffs from further harassment and retaliation, magnified the hostile work environment at the MBP.

173.   Following their report, Plaintiffs were subject to a hostile work environment in the form of degrading, demeaning, humiliating and offensive treatment, statements, and conduct by MDOC employees designed to intimidate and silence them.

174.   The post-report hostile work environment was based on Plaintiffs' sex.

175.   The post-report hostile work environment had the effect of unreasonably interfering with Plaintiffs' work environment.

176.   Plaintiffs reported these changes to Defendant, but nothing was done.

177.   Defendant's actions have damaged Plaintiffs as described above and herein.

**COUNT II**
**Retaliation in Violation of Title VII**

178.   Plaintiffs engaged in protected activity protected by Title VII when they reported Burton's sexual harassment and assault, participated in the internal investigation, filed notices of intent with the Michigan Court of Claims, and filed charges of discrimination with the EEOC.

179.   Defendant was aware of Plaintiffs' protected activity.

180.   Following their protected activity, Plaintiffs were retaliated against by employees who supported Burton, as set forth above.

181.   Defendants were aware of this retaliation but took no action to adequately investigate or promptly remedy the harassment or to deter or prevent the retaliation.

182.   Defendant further retaliated against Jane K. Doe by opening a new investigation against her and attempting to discipline her.

183.   Defendant further retaliated against Jane N. Doe by denying her bereavement leave granted to others under similar circumstances, including a female coworker who recanted her allegations against Burton.

21

184. Defendant further retaliated against Jane A. Doe by transferring her to a less desirable position and refusing to return her to her former position following Burton's resignation resulting in constructive discharge.

185. Defendant further retaliated against Jane B. Doe by assigning her to a less desirable and more dangerous work assignment following her release to full duty and rejecting her application for the Chaplain vacancy, resulting in her constructive discharge.

186. Defendant's actions were motivated by Plaintiffs' complaints of sexual harassment/assault, participation in the ensuing investigation, filing of notices of intent, and/or filing of charges with the EEOC.

187. Defendant's actions have damaged Plaintiffs as described above and herein.

## COUNT III
### Violations of the Elliott-Larsen Civil Rights Act (ELCRA)
### MCL §37.2101 *et seq.*

188. Defendant was, at all relevant times, an employer as defined by the ELCRA.

189. Plaintiffs were, at all relevant times, a member of a protected group under the ELCRA.

190. Plaintiffs were subject to unwanted, repeated and/or recurrent pervasive sexual harassment as set forth herein by Burton.

191. The sexual harassment and retaliatory actions set forth herein substantially interfered with Plaintiffs' employment and created an intimidating, hostile and offensive work environment based on sex, in violation of ELCRA.

192.    Defendant MDOC had actual and constructive notice of the sexual harassment, including the retaliatory actions set forth herein, but took no action to adequately investigate or promptly remedy the harassment or to deter or prevent it.

193.    Defendant's actions have damaged Plaintiffs as described above and herein.

**COUNT IV**
**Retaliation in Violation of the Family Medical Leave Act (FMLA)**
**29 U.S.C. §2615(a)(2)**
**(Plaintiff Jane B. Doe)**

194.    MDOC is an employer covered by the FMLA pursuant to 29 USC § 2601 *et seq.* because it is a public agency, as defined by Congress.

195.    Plaintiff Jane B. Doe is an eligible employee under the FMLA, because she was employed by the MDOC for more than six years prior to requesting FMLA and had been employed by the MDOC for more than 1,250 hours in the preceding 12 months.

196.    Jane B. Doe exercised her FMLA rights by taking intermittent leave for a serious health condition related to her heart the summer of 2024.

197.    To shield herself from Burton's unwanted sexual advances, Jane B. Doe repeatedly applied for numerous positions she was qualified for and physically able to perform that would have taken her out of his reach, but she was passed over due to "time and attendance" issues involving her use of intermittent leave.

198.    While on approved intermittent FMLA, Jane B. Doe was denied job opportunities as a direct result of taking protected FMLA leave.

199.    And, on her release from light duty, as described above, Jane B. Doe was not returned to her original assignment, much less a position appropriate for her seniority.

200.    MDOC's conduct constitutes unlawful retaliation against Jane B. Doe in violation of her rights under the FMLA, 29 U.S.C. §2615(a).

201.    As a direct and proximate result of the MDOC's wrongful acts and omissions, Jane B. Doe has suffered and continues to suffer substantial losses, including expenses related to additional medical treatment and past and future lost wages and benefits.

202.    Jane B. Doe is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

### DAMAGES

203.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered:

  a. Lost wages, bonuses, benefits, incentives, and other income earning opportunities both in the past and into the future;

  b. An impairment of their earning capacity and ability to work; and

  c. Reputational harm, emotional distress, mental anguish, humiliation, embarrassment, now and into the future.

### JURY DEMAND

Plaintiffs demand a jury trial.

### RELIEF REQUESTED

*W H E R E F O R E,* Plaintiffs request this honorable court grant then the following relief:

  A. Accept jurisdiction over this matter;

  B. Award Plaintiffs compensatory, exemplary, and punitive damages;

C.  Award Plaintiffs reasonable attorney fees, costs, and interest;

D.  Award Plaintiff Jane B. Doe liquidated damages pursuant to 29 U.S.C. §2617(a)(1)(A)(iii);

E.  Award Plaintiff Jane B. Doe non-economic damages for emotional distress and mental anguish; and

F.  Grant Plaintiffs such additional or alternative relief as the Court deems just and proper.

Respectfully submitted,

Attorneys for Plaintiff

**ROUMEL LAW**

*/s/ Nicholas Roumel*

Nicholas Roumel (P37056)
4101 Thornoaks Dr.
Ann Arbor MI 48104
(734) 645-7507
*Nick@roumel-law.com*

**MARCOTTE LAW, PLLC**

*/s/ Wendy E. Marcotte*

Wendy E. Marcotte (P74769)
102 W. Washington St., Ste. 217
Marquette MI 49855
(906) 204-5343
July 28, 2026                    *Wendy@marcottelaw.us*

'